IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RINANDO T. TUCKER )
)
                    Petitioner, )
)
vs. )          CIVIL NO. 06-cv-00998-GPM
)
MIKE ATCHISON )
)
                    Respondent. )

# MEMORANDUM AND ORDER

**MURPHY, District Judge:**

This matter is before the Court on Petitioner Rinando Tucker's amended petition for writ of

habeas corpus, filed pursuant to 28 U.S.C. § 2254 (Doc. 29).  Respondent filed an answer to the

petition on October 14, 2009 (Doc. 33).  For the following reasons, the petition is **DENIED**.

## FACTUAL BACKGROUND

On October 20, 1997, a jury in St. Clair County, Illinois, found Mr. Tucker guilty of the

murders of Martin and Judith Dotson (Doc. 20-9, Ex. K)**.**  The trial court sentenced Mr. Tucker to

natural life in prison.

The following factual background has been taken from the direct appeal decision on Mr.

Tucker's case rendered by the Illinois Fifth District Appellate Court on November 3, 2000.

> The victims, Marty and Judy Dotson, husband and wife, were murdered in their
> home late in the evening on April 17, 1997, or early in the morning on April 18,
> 1997.  Defendant, age 20 at the time of the murders, did not deny his presence at the
> scene, but denied killing the victims.   Tucker asserted that Brandon "Buck"
> Craighead, age 16, was the shooter. Tucker was tried under an accountability theory.
> Craighead was tried separately.

The evidence showed that on April 18, 1997, Centreville Police Sergeant William Miller was working the midnight shift. During his shift, he observed a Chevy Corsica being driven in a strange manner and attempted to investigate; however, the driver of the Corsica would not stop. A chase ensued. Ultimately, the Corsica came to a stop and its occupants fled on foot. Sergeant Miller found a cellular phone near the car. He ran the plates on the car and found that the car was registered to Marty Dotson . . . .

At 9 a.m. on April 18, 1997, Centreville Police Officer Gregory Hosp was dispatched to the victims' home to check on their well-being. When Officer Hosp arrived, he found the front door partially open. Upon entering the home, he discovered Marty Dotson's body slumped on a bar stool and Judy Dotson dead on her bed. Each victim died from a single, close contact gunshot to the head. Crime-scene technicians were then called to the scene . . . .

Patricia Jackson, a crime scene investigator for the Illinois State Police, arrived, at approximately 10:43 a.m. She found no evidence of forced entry. Both bedrooms were ransacked. She collected People's Exhibit 5c, latent fingerprints from the inside of the front door and from a metal box found on a bedroom floor. The print from the metal box was transferred and labeled as People's Exhibit 5b. A fingerprint expert identified the latent print as a fingerprint of defendant's left middle ring finger. Judy Dotson's daughter, Karin Morales, testified that she had seen the two metal boxes at the victims' home, but she did not know what was stored in those boxes. She also testified that the victims kept several pieces of jewelry in their bedroom.

Other evidence collected at the scene included, *inter alia*, a shell casing discovered in the living room, People's Exhibit 18, and a shell casing discovered in the bedroom, People's Exhibit 17. Spent projectiles were later retrieved from the bodies of the victims and introduced at the trial as People's Exhibits 12 and 13 . . . .

Detective Coppetelli of the Collinsville Police Department testified that on April 19, 1997, as part of his duties with the Major Case Squad, he . . . recovered a firearm from Judy Dotson's son, Tim Foster. Detective Coppetelli interviewed Foster, who indicated that he had a firearm at his residence. Foster turned the firearm over to the police. The gun was analyzed and identified as a .32-caliber, but was not connected to the crime in question. The gun was marked as People's Exhibit 7 and shown to the jury. Likewise, People's Exhibit 8, a super-automatic, .38-caliber Colt pistol, which was not connected to the crime, was shown to the jury. However, after defense counsel objected, the State withdrew its motion to have the guns admitted into evidence. Collinsville Police Officer Todd Link testified that he retrieved the .38-caliber gun from Michael Gillespie on April 20, 1997. The State failed to tie up Gillespie's connection with the investigation.

Thomas Gamboe, Jr., a forensics, firearm, and toolmark expert, examined People's Exhibits 7 and 8, along with People's Exhibits 12 and 13, which were, in his opinion, bullets from a .38-caliber or 9-millimeter weapon, and People's Exhibits 17 and 18, the discharged cartridge cases.  Gamboe opined that Exhibits 12 and 13 were fired from the same weapon, as were Exhibits 17 and 18.  Gamboe further opined that Exhibits 12 and 13, the spent projectiles, could not have been fired from either People's Exhibit 7 or 8.

John Vickers, who lived on 36th Street in East St. Louis, testified that on April 18, 1997, at approximately 3 a.m., he got up to use the bathroom and noticed that someone had piled trash near his trash cans, which he had set out the night before to be picked up the following morning. Mr. Vickers returned to bed, but he stopped his car on the way to work to try to stuff the extra trash into a trash bag.  Some of the items would not fit, so Mr. Vickers set them in his house to be sorted through later. When he arrived home from work in the evening, he attempted to stuff the extra trash into a trash bag.  He then watched the evening news and learned of the victims' murders.  He realized that he had seen Mr. Dotson's name on one of the papers in the trash left by the trash cans.  Mr. Vickers called his attorney to find out what to do. His attorney advised him to keep what he had and bring it to the attorney's office where he met with the police and handed over the trash. Items included an ashtray, a car caddy, a glove, and papers.  These items were introduced into evidence as People's Exhibit 33.

Shondreka Hinkle, age 17, testified that near the date of the murders, Tucker and Craighead were at her house while she was babysitting for her four-year old nephew. Craighead had a gun and insisted on showing her. At one point, Craighead handed the gun to the four-year-old.  Hinkle got angry and struck the gun out of her nephew's hand.  On that same evening, Craighead told her that he needed some money and was going to kill a woman in Parkside.  According to Hinkle, defendant told Craighead to be quiet because Hinkle might tell someone.

Angeletta Jacobs . . . recalled that on the evening when the victims were killed, she was with Craighead and defendant at her mother's house. They arrived about 9 p.m. . . . Craighead had a gun, which he showed to defendant.  Jacobs testified that Craighead told defendant it was a 9-millimeter.  Craighead and defendant left a little before 10 p.m.  Jacobs received a phone call from defendant at about midnight.  A few minutes after her conversation with defendant, Craighead called her.  Jacobs recalled that both conversations were normal conversations and that nothing seemed out of the ordinary.

A records officer for Ameritech testified about the billing records from the victims' cellular phone.  Two telephone calls were billed to the phone on April 17, 1997.  The first was an incoming call at 2:34 p.m.; the second was an outgoing call at 11:29 p.m. Six outgoing calls were billed to the cellular phone on April 18, 1997, at the

following times:  12:21 a.m., 12:43 a.m., 1:21 a.m., 1:21 a.m., 4:11 a.m., and 4:28 a.m.

Defendant left the area after the murders and went to stay with relatives in Beloit, Wisconsin, where he was arrested. . . . After searching the house in Beloit where defendant was staying, police found, hidden beneath the carpet in a bedroom, photocopies of newspaper articles concerning the victims' murders.

On May 7, 1997, defendant was interrogated in Beloit by police officers, including, Sergeant Steve Brown of the Centerville Police Department.  Defendant gave a nine-page written statement to police, as well as a videotaped statement.  Both the written statement and the videotape were introduced into evidence.  The videotape was played to the jury.

Outside the presence of the jury, the State moved for admission of any exhibits not previously introduced into evidence.  Defense counsel objected to the admission of the weapons, citing *People v. Wade*, 51 Ill. App.3d 721, 366 N.E.2d 528 (1977), on the basis that it was reversible error to admit weapons that are in no way connected to the crime.  The prosecutor argued that the guns were admissible to show that a thorough investigation had been conducted by the police.  The trial court reserved its ruling.  Ultimately, the State withdrew its motion to admit the guns . . . .

Defense counsel also stated that as part of his trial strategy he was not going to introduce favorable character evidence on defendant's behalf.  Defense counsel explained that if he introduced character evidence, the State could rebut such evidence with details of a pending burglary investigation of defendant.  Defendant took the stand in his own defense.

Defendant testified that prior to the night in question, he socialized with Craighead on only two or three occasions. He was with Craighead on the night of the murders because Craighead wanted defendant to meet his cousin from Kansas City, who was visiting and thinking about giving defendant a job.  Defendant could not remember Craighead telling Ms. Hinkle that he was going to kill someone.  He did, however, remember the incident involving Hinkle's four-year-old nephew.  Defendant denied planning the events of the evening or planning to rob anyone.

Defendant explained that Mr. Dotson had a reputation for helping kids, including defendant.  Defendant had been to the victims' homes on other occasions, and Mr. Dotson had paid him to do odd jobs.  Defendant testified that he and Craighead arrived at the victims' home between 9:00 p.m. and 11 p.m., after Craighead suggested that they go to the victims' house.  Mr. Dotson let them in after defendant identified himself.  Mr. Dotson padlocked the door after defendant and Craighead entered.  Defendant and Craighead had brandy, cigars and marijuana.  Defendant opened a cigar and put some marijuana inside it and smoked it.  The three socialized.

Mr. Dotson asked defendant how his mother was doing, and defendant responded that she was fine. Mr. Dotson then asked Craighead how his mother was doing, and Craighead went ballistic, screaming at Mr. Dotson that it was wrong to be asking about his mother. Mr. Dotson and Craighead locked arms, but defendant interceded, and the situation seemed calmer; however, Craighead suddenly got up, drew his gun from his pants, and shot Mr. Dotson. Defendant told Craighead that he was going to leave, but Craighead turned the gun on defendant and told him that he was not going anywhere and that even if he wanted to leave, he could not because the door was padlocked.

Mrs. Dotson, who was in a back room, then called out and inquired about the loud noise. Craighead ran into the bedroom and shot Mrs. Dotson. While Craighead was in the bedroom, defendant attempted to leave, but he was stopped by the padlock. Defendant went into the kitchen and smoked a cigarette in an attempt to calm his nerves. He heard Craighead turning over things in the back of the house. Craighead appeared, carrying jewelry and other items. Craighead still had the gun and told defendant it was time for them to leave.

They exited by the front door, and defendant tried to get away quickly because he feared neighbors would see him leaving the house after the shooting. Defendant made some calls to try to find a place to spend the night. He recalled the chase with the police officer and explained that he had been drinking and was not thinking clearly. He was afraid the police would conclude that he had been involved in the shootings, so he ran away. He thought the police would catch only him and pin the murders on him. He testified that he never intended to kill the victims and denied stealing anything. He said that he had been to the victims' home a week or so before the murders and had helped them move some things; however, he did not remember ever touching the metal boxes that had been introduced into evidence. The morning after the shooting, defendant asked his mother to take him out of town. He went to a cousin's house in Rockford, but after a couple of weeks he went to another cousin's house in Beloit. Defendant agreed that his videotaped statement was accurate. The defense rested.

Defense counsel objected to the admission of the trash that Mr. Vickers discovered in his yard. Initially, the trial court sustained the objection but then allowed it for a limited purpose. The State argued that it was necessary to show that Vickers was an innocent man who found some evidence and reacted by giving it to the police, whereas defendant reacted by running away to Wisconsin. The trial court allowed the evidence, and the State discussed the trash during rebuttal.

The jury retired to consider its verdict at 12:05 p.m. At 4 p.m. the jury sent a note asking if they could have the written statement of Ms. Hinkle. The trial court and the lawyers agreed that the statement should not be given to the jury because it was never introduced into evidence. The trial court then stated on the record that an hour

Page 5 of  26

earlier the jury had asked the bailiff for a transcript of the entire trial.  Without consulting anyone, the bailiff told the jury that the transcript was not available.  The trial court concluded that the bailiff's answer was correct, and both the prosecutor and defense counsel agreed.  At 7:45 p.m., the jurors announced that they were deadlocked.  At 9:50 p.m., the jury came back with guilty verdicts on both counts.

(Doc. 20-9, Ex. K); *See People v. Tucker*, 738 N.E.2d 1023 (Ill. App. Ct. 2000).

# PROCEDURAL HISTORY

### A. Direct Appeal

Mr. Tucker, with the assistance of counsel, appealed the conviction and sentence, raising the following grounds for relief:  1) he was denied effective assistance of counsel because his trial attorney (a) failed to object to the State's presentation of two unrelated firearms and (b) failed to present favorable character evidence for fear the State could rebut the evidence with evidence of an unrelated pending investigation against Mr. Tucker; and 2) the prosecutor's improper actions denied him a fair trial, which included (a) presenting two guns to the jury unrelated to the case, (b) presenting evidence of papers bearing the victim's name found in a third party's trash can, and (c) arguing Mr. Tucker's guilt was established by comparing his actions with those of an individual who found the papers in the trash (Doc. 20-9, Ex. K).  On November 3, 2001, the Illinois Court of Appeals affirmed the conviction.  *Id.*

Mr. Tucker filed a Petition for Leave to Appeal ("PLA") urging the Illinois Supreme Court to reverse the appellate court's findings (Doc. 20-11, Ex. L).  The Illinois Supreme Court summarily denied Mr. Tucker's PLA on January 29, 2001 (Doc. 20-12, Ex. M).

### B. Petition for Post-Conviction Relief

Mr. Tucker filed a *pro se* petition for post-conviction relief on October 25, 2000 (Doc. 20-13, Ex. N).  An amended petition was filed by appointed counsel on August 2, 2001.  *Id.*  Mr. Tucker raised the following grounds for post-conviction relief:

1) The trial court violated his Fourteenth Amendment right to a fair trial by denying his request for a jury instruction defining "intent";

2) The trial court violated his right to confront the witnesses against him by allowing Shondreka Hinkle, a prosecution witness, to testify about statements made by petitioner's co-defendant;

3) The trial court violated his right to a fair trial by:

    a.   denying the jury's request to see the statement made by Ms. Hinkle to the police.

    b.   denying the jury's request for transcripts of the trial.

    c.   speaking to the jury outside the presence of Mr. Tucker and his counsel.

4) The prosecutor engaged in prosecutorial misconduct by:

    a.   misstating the evidence to the jury.

    b.   vouching for and bolstering the credibility of State witnesses.

    c.   suppressing evidence of the co-defendant's mental illness and medical history.

5) The co-defendant has now made a statement fully supporting Mr. Tucker's theory at trial, which constitutes newly discovered evidence of his innocence; and

6) Mr. Tucker was denied the effective assistance of his trial counsel in the following ways:

    a.   trial counsel failed to object to the State's offer of an improper jury instruction, IPI Criminal 2.03.

    b.   trial counsel failed to adequately prepare for trial.

    c.   trial counsel failed to adequately communicate with petitioner before trial.

    d.   trial counsel failed to file pretrial motions.

    e.   trial counsel failed to impeach prosecution witnesses.

    f.   trial counsel failed to impeach Sgt. William Miller of the Centreville Police Department.

(Doc. 20-13, Ex. N).  On September 27, 2001, the State filed a motion to dismiss the amended post-conviction petition on the basis that the allegations were either waived or *res judicata* (Doc. 20-16, Ex. Q).

On December 13, 2001, Mr. Tucker was granted leave to file a second amended petition for post-conviction relief (Doc. 20-16, Ex. Q).  The second amended petition was filed on December 19, 2001.  *Id.*  It re-alleged the allegations in the amended petition and added the allegation of ineffective assistance of appellate counsel.  *Id.*  On October 3, 2003, the trial court held a hearing on the merits of the second amended petition for post-conviction relief (Doc. 20-13, Ex. N).  The trial court denied Mr. Tucker's second amended petition for post-conviction relief.  *Id.*  The trial court found as follows:

(1) "intent" has a plain meaning within a jury's common understanding; and, absent a specific request by the jury for a definition of "intent," it is not error to refuse petitioner's instruction; (2) petitioner's statement to the co-defendant in Hinkle's presence was not hearsay but was an admission by petitioner, and the co-defendant's statement was necessary to place the admission in context; (3) the court did not err in (a) refusing to furnish the jury with Hinkle's written statements because the statement was not admitted into evidence, (b) refusing to furnish the jury with the trial transcript; (4) the record does not support petitioner's claim that the judge communicated to the jury outside of the presence of the petitioner or his counsel; (5) the prosecutor did not engage in prosecutorial misconduct because (a) the prosecutor's closing argument was supported by the evidence or constituted a fair inference from the evidence, (b) the prosecutor did not misstate the law of accountability during her closing argument and (c) petitioner presented no evidence that the State withheld or suppressed evidence of mental illness on the part of the co-defendant; (5) the co-defendant's statement at the evidentiary hearing was "unreliable" and the "alleged newly discovered evidence is not of such conclusive character that it would probably change the outcome on retrial"; (6) trial counsel was not in effective for (a) failing to submit IPI Criminal 2.03 because that instruction should be given only when the jury is instructed on both first and second degree murder, (b) failing to adequately prepare for trial as petitioner has not shown what further preparations his trial counsel should have made, (c) trial counsel's testimony that he regularly met with petitioner to discuss the case was credible, (d) petitioner has not shown what pretrial motions should have been filed and (e) there is no evidence that Sgt. Miller placed any personal calls from the victim's cell phone after he recovered it, and therefore, "any possible evidence of impeachment would not have affected the result of the trial.

(Doc. 20-13, Ex. N).

     Mr. Tucker appealed the denial of his post-conviction petition(Doc. 20-14, Ex. O).  On December 8, 2004, Mr. Tucker's appellate counsel filed a motion to withdraw as counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), alleging the appeal had no merit.  *Id.* Mr. Tucker filed a response to the motion and reasserted several claims from his petition for post-conviction relief (Ex. 20-15, Ex. P).

     The Illinois Court of Appeals reviewed the  record and affirmed the dismissal of the post-conviction petition. (Doc. 20-16, Ex. Q).  The appellate court addressed two of Mr. Tucker's ineffective assistance of counsel claims that did not appear on the face of the record and denied

the remaining ineffective assistance of counsel claims stating, "issues defendant raised on direct appeal are barred from consideration by the doctrine of *res judicata*, and issues that defendant could have raised, but did not, are considered forfeited." *Id.*  The court also held the law-of-the-case doctrine barred re-litigation of the claims raised by Mr. Tucker in his response to appellate counsel's motion to withdraw. *Id.*  The court denied the remaining issues raised in the second amended petition as meritless. *Id.*

On September 27, 2005, Mr. Tucker filed a PLA arguing (1) the trial court violated his right to a fair trial by denying his request for a jury instruction defining "intent", (2) his due process rights were violated when (a) the trial court denied the jury's request to see the statement made by Ms. Hinkle to the police, (b) the trial judge spoke to the jury outside the presence of Mr. Tucker and his counsel, (c) the prosecutor misstated the evidence, (d) the prosecutor vouched for and bolstered the credibility of the State's witnesses, (e) the trial court allowed Ms. Hinkle to testify about statements made by the petitioner and co-defendant, (3) trial counsel was ineffective for (a) failing to adequately prepare for trial, (b) failing to file pretrial motions, (c) failing to impeach State witnesses, (d) failing to move to suppress a cell phone, cell phone bills and Sgt. Miller's statement, and (4) newly discovered evidence establishes Mr. Tucker's innocence (Doc. 20-17, Ex. R).  The Supreme Court of Illinois summarily denied the PLA on December 1, 2005 (Doc. 20-18, Ex. S).

### *C. Petition for Relief from Judgment*

On August 6, 2006, Mr. Tucker filed a petition for relief from judgment pursuant to 735 ILCS 5/2-1401.  (Doc. 34-1, Ex. T)  Mr. Tucker argued his convictions and sentences are void because he was never charged with armed robbery or murder based upon accountability. *Id.*  The trial court denied the petition ( *Id.)* In September 2008, the Illinois Court of Appeals affirmed the trial court, finding Mr. Tucker's petition "meritless as a matter of law" (Doc. 29-1).  The Illinois Supreme Court summarily denied Mr. Tucker's PLA on March 25, 2009. (Doc. 34-1, Ex. T).

### D. Federal Habeas Petition

Mr. Tucker filed his initial *pro se* petition for writ of habeas corpus in federal court on December 5, 2006. On May 16, 2007, this Court granted Mr. Tucker's motion for stay and abeyance to allow him to fully exhaust additional claims pending in the Illinois Court of Appeals (Doc. 21). The stay was lifted on June 2, 2009, and Mr. Tucker was granted leave to file an amended petition (Doc. 27). Accordingly, Mr. Tucker filed the amended petition on June 22, 2009, and Respondent timely answered (Doc. 33). The amended petition (Doc. 29) is operative, and the Court will not consider claims raised in previously-filed petitions not included in the amended petition. Mr. Tucker raises the following grounds for relief:

**Claim 1**: the trial court violated Mr. Tucker's due process rights and right to a fair trial by allowing testimony of inculpatory statements made by Mr. Craighead, who did not testify at trial.

**Claim 2**: the trial court violated Mr. Tucker's due process rights and right to a fair trial when:(a) the trial judge spoke to the jury outside the presence of Mr. Tucker and his counsel; and (b) the trial judge denied the jury's request to rehear testimony and statements from trial.

**Claim 3**: the trial court violated Mr. Tucker's due process rights and right to a fair trial by denying his request for a jury instruction defining "intent."

**Claim 4**: the trial court violated Mr. Tucker's due process rights and right to a fair trial by allowing the prosecutor to present two unrelated firearms to the jury.

**Claim 5**: the trial court violated Mr. Tucker's due process rights and right to a fair trial by allowing admission of papers containing the victim's name, found in a third party's trash.

**Claim 6**: the trial court violated Mr. Tucker's due process rights and right to a fair trial by allowing the prosecutor to argue Mr. Tucker's guilt was established by comparing his actions with those of an individual who found the papers in the trash.

**Claim 7**: the trial court violated Mr. Tucker's due process rights and right to a fair trial by allowing the prosecutor to misstate the evidence, inflame the passion of the jury and vouch for and bolster the credibility of the State's witnesses.

**Claim 8**: the trial court violated Mr. Tucker's due process rights and right to a fair trial by allowing the prosecutor to misstate the law on accountability.

**Claim 9**: trial counsel was ineffective for failing to investigate or interview known State witnesses, or impeach them at trial.

**Claim 10**:  trial counsel was ineffective for failing to object to the presentation to the jury of two firearms, which were not related to the case.

**Claim 11**: trial counsel was ineffective because counsel failed to present favorable evidence for fear the State would rebut the evidence with an investigation in an unrelated matter.

**Claim 12**:  trial counsel was ineffective for failing to move to suppress a cell phone, cell phone billing records, and for failing to use the documents for impeachment purposes.

**Claim 13:** Mr. Tucker is innocent, as demonstrated by Mr. Craighead's affidavit, medical history, and testimony at the evidentiary hearing.

**Claim 14**:  the State and the trial court violated his due process rights and right to a fair trial by unlawfully amending the indictment through the jury instructions, to include an offense that was never charged or presented to the charging body (armed robbery).

**Claim 15**:  the trial court violated his due process rights and right to a fair trial by instructing the jury on the offense of felony murder and finding him guilty of felony murder, though Mr. Tucker was never charged with the offense of armed robbery.

**Claim 16**:  the trial court violated his due process rights and right to a fair trial by allowing Mr. Tucker to be convicted both as a principal and an accomplice to the same crime.

**Claim 17**:  the trial court violated his due process rights by allowing the prosecution to disregard the statutory authority of "commencement of prosecution" and "compulsory joinder."

## ANALYSIS

This petition is governed by the provisions of the Anti-Terrorism and Death Penalty of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under Section 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established Supreme Court precedent when it reaches a legal conclusion that is opposite to a legal conclusion announced by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Owens v. Frank*, 394 F.3d 490, 496-97 (7th Cir. 2005). A state court's conclusion is an "unreasonable application" of Supreme Court precedent when the state court identifies the correct legal rule as determined by the Supreme Court, but unreasonably applies it to the facts of the case, unreasonably extends a legal principle from existing precedent, or refuses to extend that principle to a new context where it should apply. *Owens*, 394 F.3d at 496-97. Indeed, the writ may not issue merely because the state court erroneously applied clearly established federal law; the application also must be unreasonable. *Williams*, 529 U.S. at 411; *see also Owens*, 394 F.3d at 497. A petitioner bears the burden to show that he is entitled to relief. *See Harding v. Sternes*, 380 F.3d 1-34, 1043 (7th Cir. 2004).

The Supreme Court recently reiterated that a federal court on habeas review should treat a state court's decision with "deference and latitude." *Harrington v. Richter*, 131 S.Ct. 770, 787 (2011). A federal court's inquiry in habeas must *not* focus on whether a state court's decision was an incorrect interpretation of the underlying constitutional claim. *Id.* at 785. Indeed, the emphasis must be on whether the application of federal law was unreasonable. *Id.* at 787. Habeas corpus is not "a substitute for ordinary error correction through appeal," and the unreasonableness standard is "difficult to meet" because "it was meant to be." *Id.* at 786. Since the emphasis is on the reasonableness, federal habeas relief is precluded when "fairminded jurists could disagree on the correctness of the state court's decision." *Id.* "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* Section 2254(d) stops

just "short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.*

### A. Procedural Default

Before considering the merits of a federal habeas petition, a federal court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). The exhaustion requirement is premised on concerns of comity; the state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). For the opportunity to be meaningful, the petitioner must "fairly present" his federal claims "through one complete round of state-court review, either on direct appeal of his conviction or in his post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). "A petitioner fairly presents his federal claim to the state courts when he articulates both the operative facts and the controlling legal principles on which his claim is based." *Perruquet*, 390 F.3d at 519-520 (internal citations omitted).

The companion procedural default doctrine precludes a federal court from reaching the merits of a habeas petition when either:  (1) the claim was not fairly presented to the state courts and the opportunity to raise that claim now has passed; or (2) the claim was presented to the state courts and was denied on the basis of an adequate and  independent state law procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Perruquet*, 390 F.3d at 514.

A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice by showing the court's failure to consider the claim would result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. To establish cause, Mr. Tucker must show "an external impediment" prevented him from presenting his arguments before the state courts. *Bintz v. Bertrand*, 403 F.3d 864, 859 (7th Cir. 2005). To show prejudice, he must present evidence that the errors at trial "worked to his actual and substantial disadvantage, infecting his

entire trial with error of constitutional dimensions." *Perruquet*, 390 F.3d at 515 (quoting *United States v. Frady*, 456 U.S. 152 (1982) (emphasis omitted).

### *I. Claims 7 and 8 - Improper Comments of Prosecutor*

In claims 7 and 8, Mr. Tucker argues the trial court violated his due process rights and right to a fair trial by allowing the prosecutor to (1) misstate the evidence, inflame the passion of the jury and vouch for and bolster the credibility of the State's witnesses; (2) misstate the law on accountability.

Mr. Tucker advances five specific instances to support his claim of prosecutorial misconduct. According to Mr. Tucker, the prosecutor: (1) made a remark during opening statements regarding his statement to the police; (2) made a remark during closing argument speculating about his involvement in the crime; (3) appealed to the jury's passion by presenting witness testimony of the victims' daughter; (4) vouched for the credibility of Ms. Hinkle's statement during closing argument; and (5) misstated the law on accountability.

A review of the state court record reveals that Mr. Tucker did not fairly present these claims to the state courts.  To determine whether a constitutional issue has been fairly presented, a district court considers four factors:

> 1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases that apply a constitutional analysis; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

*Ward v. Jenkins*, 613 F.3d 692, 697-698 (7th Cir. 2010) (citing *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001)).

The claims Mr. Tucker raised in his post-conviction petition, and subsequent appeals, dealt with factually and legally unsupported claims that his due process rights were violated as a result of the prosecutor's improper conduct. Mr. Tucker did not rely on any federal constitutional provision and cited no case employing a constitutional analysis. The only common theme to his prosecutorial

misconduct claims are the phrases "due process" and "fair trial" in the heading of the claims. *See Ward*, 613 F.3d at 697 (citing *Curtis v. Montgomery*, 552 F.3d 578, 583 (7th Cir. 2009)). Accordingly, Mr. Tucker did not fairly present his constitutional claims to the state courts. Claims 7 and 8 are procedurally defaulted.

Of course, the Court has reviewed the record and finds no cause or prejudice. Indeed, the Court's finding that Claims 7 and 8 have been defaulted does not result in a fundamental miscarriage of justice.

## *II. Claim 12*

In claim 12, Mr. Tucker asserts that his trial counsel was ineffective for not moving to suppress a cell phone and cell phone records. Mr. Tucker also takes issue with his trial counsel for failing to use these records for impeachment purposes. In the direct appeal of his criminal conviction, Mr. Tucker alleged multiple instances of ineffective assistance of counsel (*See* Doc. 20-9, Ex. K). Yet, Mr. Tucker never claimed this specific instance of ineffective assistance of counsel until the post-conviction proceedings.

In Mr. Tucker's post-conviction proceedings, the trial court denied the claim on its merits. Accordingly, the appellate court declined to review the claim stating, "defendant was given an opportunity to litigate fully his ineffective assistance claim in his first appeal to this court," thus "issues that defendant could have raised, but did not, are considered forfeited"[1] (Doc. 20-16, Ex. Q).

Federal courts may not review issues of federal law under a habeas petition if those issues have been resolved by a state court on adequate and independent state law grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Here, the appellate court's decision found Mr. Tucker waived his ineffective assistance of counsel claim by failing to raise it on direct appeal. *See Gomez v. Jaimet*, 350 F.3d 673, 678 (7th Cir. 2003) (under Illinois law, waiver operates as an independent and

---

[1] The Illinois Supreme Court observed that Illinois courts have used the terms "waiver" and "forfeiture" interchangeably. *People v. Blair*, 831 N.E.2d 604, 615 (Ill. 2005).

Page 15 of 26

adequate state ground barring federal habeas review).   Accordingly, this claim is procedurally defaulted.

Mr. Tucker asserts no argument regarding cause and prejudice.   Yet, the Court's review of the record does not reveal prejudice or a fundamental miscarriage of justice.   Therefore, the Court finds Claim 12 is procedurally defaulted.

### III. Claims 14, 15, 16, and 17

In Claim 14, Mr. Tucker argues the trial court violated his due process rights and right to a fair trial by amending the indictment through the jury instructions, to include the offense of armed robbery, which he was never formally charged with.   In Claim 15, Mr. Tucker argues the trial court violated his due process rights and right to a fair trial by instructing the jury on the offense of felony murder. Mr. Tucker, in Claim 15, also alleges violations for being found guilty of felony murder, despite never being charged with armed robbery.   In Claim 16, Mr. Tucker argues the trial court violated his due process rights and right to a fair trial by allowing him to be convicted both as a principal and an accomplice to the same crime.   In Claim 17, Mr. Tucker argues the trial court violated his due process rights and right to a fair trial by allowing the prosecution to disregard the statutory authority of "commencement of prosecution" and "compulsory joinder."

Mr. Tucker raised these four claims only in his petition for relief from judgment, which he filed pursuant to 735 ILCS 5/2-1401, and in the subsequent appeal.   "A section 2-1401 petition for relief from judgment is the forum in a criminal case in which to correct all errors of fact occurring in the prosecution of a cause, unknown to the petitioner and court at the time judgment was entered, which, if then known, would have prevented its rendition." *People v. Haynes*, 192 Ill.2d 437, 461 (Ill. 2000).   In contrast, a post-conviction petition asks the court to determine whether the defendant's constitutional rights were violated at trial. *Pinkonsly*, 207 Ill.2d at 556.

Under federal habeas corpus jurisprudence, "[a] state is entitled to treat as forfeited a proposition that was not presented in the right court, in the right way, and at the right time – as state

rules define those courts, ways, and times." *Szabo v. Walls*, 313 F.3d 392, 395 (7th Cir. 2002) (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977)). In Illinois, a petitioner seeking federal habeas review must assert his claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings. *Lewis*, 390 F.3d at 1025.

Since Mr. Tucker failed to raise Claims 14, 15, 16 and 17 in his direct appeal or second amended post-conviction petition and subsequent appeal, these four claims have not received one complete round of state court review. The Court's review of the record does not reveal cause or prejudice for Mr. Tucker's failure to correctly raise these claims. Likewise, the record does not reveal a fundamental miscarriage of justice. Accordingly, Mr. Tucker has procedurally defaulted these claims.

### B.  Non-Cognizable Claims

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991). As such, state law errors concerning state law issues are generally not cognizable on habeas review. *Id.*; *see also Perruquet*, 390 F.3d at 51. More specifically, the "remedial power of a federal habeas court is limited to violations of the petitioner's federal rights . . . ." *Perruquet*, 390 F.3d at 511. "[O]nly if a state court's error has deprived the petitioner of a right under federal law can the federal court intervene." *Id*.

### I. Claim 3

Mr. Tucker claims the trial court violated his due process rights and right to a fair trial by denying his request for a jury instruction defining "intent." He claims the instruction was necessary because the instructions given on accountability and armed robbery required the State to prove intent. The post-conviction trial court denied Mr. Tucker's claim finding "'intent' has a plain meaning within a jury's common understanding; and, absent a specific request by the jury for a

definition of 'intent,' it is not error to refuse to give this instruction" (Doc. 20-13, Ex. N). The appellate court agreed (Ex. 20-16, Ex. Q).

Issues that involve jury instructions are considered questions of state law and are not proper subjects of federal habeas review under 28 U.S.C. § 2254. *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993); *Estelle*, 502 U.S. at 71-72. A petitioner will only have a cognizable claim if a state court's error in applying state law is so prejudicial that it violates a petitioner's Fourteenth Amendment right to a fair trial, and thus creating the likelihood an innocent person was convicted. *Perruquet*, 390 F.3d at 510, 511-512.

Here, Mr. Tucker's claim does not clearly implicate his right to a fair trial. Mr. Tucker does little more than reference the phrases "due process" and "right to a fair trial" in the heading of his claim. The substance of Mr. Tucker's argument concerns the application of state law. Accordingly, Claim 3 is not cognizable in this proceeding.

## II. Claim 13

Mr. Tucker asserts he is innocent, which he claims is an independent ground for relief. Mr. Tucker's claim was rejected by the post-conviction court, and again by the appellate court.

A claim of actual innocence is not, by itself, a constitutional claim. *Schlup v. Delo*, 513 U.S. 298, 315 (1995). Rather, it is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)); *see also Milone v. Camp*, 22 F.3d 693, 699 (7th Cir. 1994) ("A claim of actual innocence is relevant to determining whether a habeas corpus petition may be brought before a federal tribunal at all; it is not ordinarily cognizable in determining whether writ should issue.") Thus, Mr. Tucker's innocence claim, as a free standing substantive ground for relief, is non-cognizable under 28 U.S.C. § 2254.

### C. Merits Review

### I. Claim 1

Mr. Tucker claims the trial court violated his due process rights and right to a fair trial by allowing the State's witness, Shondreka Hinkle, to testify about statements of his co-defendant, Mr. Craighead. Mr. Tucker claims this violated his right to confront Mr. Craighead, who did not testify at Mr. Tucker's trial.

Ms. Hinkle testified that on the evening of the murders, Mr. Craighead stated he needed some money and was going to kill a woman in Parkside (Doc. 20-13, Ex. N). According to Ms. Hinkle, Mr. Tucker immediately responded: "[b]e quiet, she is going to tell it." *Id.* The post-conviction trial court found Mr. Tucker's statement was an admission. The court found Mr. Craighead's statement constituted a hearsay exception, which did not violate the Confrontation Clause. *Id.*

The appellate court affirmed, holding that Mr. Craighead's statement was admissible under the coconspirator hearsay exception, as set forth in *People v. Cook*, 815 N.E.2d 879, 894 (Ill. App. Ct. 2000). The court found the admission of Mr. Craighead's statement did not violate *Crawford v. Washington*, 541 U.S. 36 (2004).

At the time Mr. Tucker's conviction became final, the law was clearly established that statements made by a coconspirator during the course of and in furtherance of a conspiracy are not hearsay. *Bourjaily v. United States*, 483 U.S. 171, 182 (1987); *United States v. Ceballos*, 302 F.3d 679 n.2 (7th Cir. 2002); *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). Accordingly, the appellate court's decision was not contrary to clearly established federal law, nor was it an unreasonable application of clearly established federal law.

## II. Claim 2

Mr. Tucker claims the trial court violated his due process rights and right to a fair trial when the judge: (a) spoke to the jury outside the presence of Mr. Tucker and his counsel, and (b) when the judge denied the jury's request to review testimony and statements given at trial.

During jury deliberations, the jurors sent a note requesting the written statement of Ms. Hinkle (Doc. 20-9, Ex. K). The trial court and the attorneys agreed the statement should not be given to the jury because it was never admitted into evidence. *Id.*

The trial court then stated on the record that an hour earlier the jury asked the bailiff for a transcript of the entire trial. *Id.* The bailiff did not consult the trial judge, and told the jury the transcript was not available. *Id.* All parties agreed the bailiff's response was proper, as the trial judge would have given the same response (Doc. 20-13, Ex. Q). Indeed, the parties agreed the trial judge would relay that response to the jury and affirm what the bailiff told the jury. *Id.*

The post-conviction trial court found that no evidence to indicate the trial judge engaged in *ex parte* communication with the jury. *Id.* The court determined the trial court's refusal to furnish the jury with the trial transcript was not an abuse of discretion. *Id.* The court also held the trial court properly denied the jury's request for Ms. Hinkle's statement, as the statement was never admitted into evidence. *Id.* The appellate court focused its attention on the latter part of Claim 2 holding "the determination of whether to grant or deny a jury's request to review transcripts of witnesses' testimony rests within the sound discretion of the trial court" (Doc. 20-16, Ex. Q).

### a. Request for Ms. Hinkle's Statement and Trial Transcript

It is generally within the trial court's sound discretion to determine whether a jury request will be granted. *See United States v. Howard*, 80 F.3d 1194, 1202 (7th Cir. 1996) (citing *United States v. Guy*, 924 F.2d 702, 708 (7th Cir. 1991)) (evidentiary questions are only subject to habeas review to the extent that they constitute a denial of fundamental unfairness). In this

case, Ms. Hinkle's written statement was not admitted into evidence.  Furthermore, the parties agreed that the jury should not be provided with the entire transcript of the trial.  The Court finds no fundamental unfairness resulted from the trial judge's refusal to provide the jury with the trial transcript or Ms. Hinkle's statement.

### *b. Ex Parte Communications*

*Ex parte* communications between a judge and a jury implicate a defendant's right to be present at every stage of the trial under the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment.  *United States v. Smith*, 31 F.3d 469, 471 (7th Cir. 1994).  "It is well settled that once the jury has begun to deliberate, counsel must be given the opportunity to be heard before the trial judge responds to any juror inquiry."  *Id.*

Mr. Tucker's claim that the trial judge spoke to the jury *ex parte*, is contrary to the explicit findings of the post-conviction trial court.  The test under the habeas statue is to determine whether the habeas petitioner has rebutted, by clear and convincing evidence, the state court's findings of fact, which are presumed to be correct. 28 U.S.C. § 2254(e)(1).  Mr. Tucker has not met that rigorous burden here.

Yet, if this Court determined an *ex parte* communication occurred between the judge and the jury, Mr. Tucker has not demonstrated the alleged communication had a prejudicial effect or rendered the trial fundamentally unfair.  *See Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004); *Ellsworth v. Levenhagen*, 248 F.3d 634, 640 (7th Cir. 2001).  The Seventh Circuit has regularly held a "brief procedural remark by the judge to the jury, off the record, will not rise to the level of a constitutional error."  *Moore*, 368 F.3d at 941; *see also Ellsworth*, 248 F.3d at 642 (finding no prejudice when the judge answered the jury's request to review evidence in the affirmative but denied request to review documents not entered into evidence)).

As previously noted, the finding of the post-conviction trial court is presumed correct. Mr. Tucker has failed to rebut this presumption, and thus Mr. Tucker's request for habeas relief on this claim is denied.

### III. Claims 4, 5 and 6

Mr. Tucker alleges multiple instances of prosecutorial misconduct. Mr. Tucker claims his due process rights and right to a fair trial were violated when the prosecutor: presented the jury with two firearms, unrelated to the case (Claim 4); presented irrelevant evidence of papers that contained the victim's name, found in a third party's trash (Claim 5); and argued Mr. Tucker's guilt could be established by comparing his actions with a third party who found the papers in the trash (Claim 6). These claims were raised in Mr. Tucker's direct appeal and in his PLA to the Illinois Court of Appeals.

On direct appeal, the court reviewed Mr. Tucker's claims under a plain error and harmless error analysis.[2] The court held the prosecutor erred in presenting evidence about the two guns. (Doc. 20-9, Ex. K). The court noted that the prosecutor "engaged in deliberate prosecutorial overkill and jeopardized a strong prosecution of the case." *Id*. The court also held the prosecutor failed to establish a connection between the papers found in the trash and the murders. *Id*. Notwithstanding these errors, the court applied the standard in *People v. Jackson*, 551 N.E.2d 1025, 1030 (Ill. App. Ct. 1990), and held the error did not reasonably affect the verdict due to the "overwhelming" evidence against Mr. Tucker. *Id*.

In evaluating a claim of prosecutorial misconduct on federal habeas review, the relevant inquiry is whether the prosecutor's "conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)

---

[2] Mr. Tucker failed to raise these alleged errors in his post-trial motion. Nevertheless, the appellate court noted that defense counsel did object to the introduction of the guns at trial. Therefore, the court reviewed the claims under the plain error and harmless error doctrines (Doc. 20-9, Ex. K).

(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)) (internal citations omitted).  Under *Darden*, the court must follow a two-step analysis when deciding whether prosecutorial misconduct is so egregious as to warrant a new trial. *Whitehead v. Cowan*, 263 F.3d 708, 728 (7th Cir. 2001).

First, the court must look at the conduct in isolation to determine whether it was improper. *Bartlett v. Battaglia*, 453 F.3d 796, 800 (7th Cir. 2006) (citing *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005)).  If the conduct appears improper, the court must then examine the conduct as a whole to determine whether it deprived the defendant of a fair trial.  *Whitehead*, 263 F.3d at 728. To make this determination, a court must consider six factors set forth in *Darden*:  "(1) whether the prosecutor misstated the evidence; (2) whether the remarks implicate specific rights of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut." *Id.*  The factor of greatest importance is the weight of the evidence against the defendant since "strong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Id.* at 729 (quoting *Rodriguez v. Peters*, 63 F.3d 546, 558 (7th Cir. 1995)).

Although the appellate court did not explicitly undertake a *Darden* analysis, it clearly considered factor deemed most important by the Seventh Circuit.  First, the court examined the prosecutor's actions in isolation and determined that while the prosecutor's actions were improper, they did not rise to the level of error reflected in other Illinois cases (Doc. 20-9, Ex. K). Next, the court examined the prosecutor's conduct in light of the record as a whole and concluded the errors of the prosecution did not unreasonably affect the verdict. *Id.*.  The court pointed out the evidence at trial demonstrated:  (1) Mr. Tucker, not Mr. Craighead, was well acquainted with the victims; (2) Mr. Tucker was clearly aware his co-defendant, Mr. Craighead, intended to murder the victims for money; (3) Mr. Tucker used his friendship with the victims to gain entry to the victims' home; (4) Mr. Tucker knowingly and willfully participated in the plan; (5) Mr. Tucker was present at the scene of the crime; and (6) Mr. Tucker fled the scene of the crime.  *Id.*

The Court may not simply consider these three claims *de novo*. Indeed, the Court must treat a state court's decision with "deference and latitude." *Harrington*, 131 S.Ct. at 787. Based upon the foregoing, the Court cannot conclude that the appellate court's decision was contrary to, or involved an unreasonable application of clearly established federal law. Mr. Tucker's request for habeas relief on Claims 4, 5 and 6 are denied.

### *IV. Claims 9, 10, and 11*

Mr. Tucker raises three claims of ineffective assistance of trial counsel. In Claim 9, Mr. Tucker argues trial counsel failed to adequately prepare for trial when counsel did not investigate or interview known State witnesses. Mr. Tucker, in Claim 9, also takes issue with trial counsel's failure to impeach State witnesses at trial. In Claim 10, Mr. Tucker argues trial counsel was ineffective for failing to object to the presentation of two unrelated firearms to the jury. In Claim 11, he argues trial counsel was ineffective for failing to present favorable evidence, due to the mistaken belief the State could rebut the evidence

Mr. Tucker raised Claim 9 in his second amended petition for post-conviction relief, his subsequent appeal and in his PLA to the Illinois Supreme Court. After an evidentiary hearing, the trial court denied Mr. Tucker's claim on inadequate preparation (Doc. 20-13, Ex. N). The appellate court affirmed the trial court on Claim 9 and declined to rule on the remainder of Mr. Tucker's ineffective assistance claims stating the "court previously ruled that the actions of the prosecutor were not so egregious to entitle defendant to a new trial. That ruling became the law of the case, and will not consider that ruling." (Doc. 20-16, Ex. Q).

Mr. Tucker raised Claims 10 and 11 in his direct appeal and in his PLA to the Illinois Supreme Court. The appellate court analyzed Mr. Tucker's claims under the framework of *Strickland v. Washington*, 466 U.S. 668 (1984), and held trial counsel "acted effectively" when he objected to the introduction of guns into evidence after it became obvious the guns were not relevant to the case (Doc. 20-9, Ex. K). The court found it unnecessary to determine whether trial counsel

was correct in not presenting character evidence on Mr. Tucker's behalf. *Id*. The court reasoned that Mr. Tucker failed to show the verdict would have been different had counsel presented the character evidence. *Id*. These claims were also presented in his PLA, which the Illinois Supreme Court summarily denied (Doc. 20-12, Ex. M).

Ineffective assistance of counsel claims are governed by the standard set forth in *Strickland*. To succeed on an ineffective assistance of counsel claim, a petitioner must prove (1) counsel's performance fell below "an objective standard of reasonableness," and (2) "there is a probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v. McKee*, 598 F.3d 374 (7th Cir. 2010) (citing *Strickland*, 466 U.S. at 688). A court's review of counsel's performance "must be highly deferential." *Strickland*, 466 U.S. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id., quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

The standards for judging performance of counsel under *Strickland* and under section 2254(d) both are highly deferential, and "[w]hen the two apply in tandem," deference is "doubly so." *Harrington*, 131 S.Ct. at 788. "When § 2254(d) applies, the question is . . . whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

The state appellate court, on direct appeal, applied the *Strickland* standard and held Mr. Tucker failed to demonstrate there was a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different (Doc. 20-9, Ex. K). The court also relied on defense counsel's testimony that, as part of his trial strategy, he declined to introduce character evidence on Mr. Tucker's behalf. *Id*. "Trial tactics are not subject to question

Page 25 of  26

by a reviewing court in deciding an ineffective assistance claim." *United States v. Limehouse*, 950 F.2d 501, 503 (7th Cir. 1991).

The state appellate court, on post-conviction review, did not employ *Strickland* in its analysis, but its ruling is not contrary to or an unreasonable application of clearly established federal law. The court rejected Mr. Tucker's claim that trial counsel failed to adequately prepare for trial. This holding was reasonable because Mr. Tucker cannot establish that, but for trial counsel's failure to investigate the background of Ms. Hinkle or other State witnesses, the result of the trial would have been different (Doc. 20-16, Ex. Q).

Based upon a review of the state court record, the Court finds that the appellate court's adjudication of Mr. Tucker's claims for ineffective assistance of counsel, on direct review and in post-conviction proceedings, did not involve an unreasonable application of clearly established federal law.

## CONCLUSION

In conclusion, Claims 7, 8, 12, 14, 15, 16 and 17 are procedurally defaulted. Claims 3 and 13 are non-cognizable under 28 U.S.C. § 2254. Claims 1, 2, 4, 5, 6, 9, 10, and 11 are without merit. Mr. Tucker's amended petition for writ of habeas corpus is **DENIED**.

**IT IS SO ORDERED.**

DATED: March 2, 2012

/s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge